UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHRISTABEL NINA,                    :
                                    :CIVIL ACTION NO. 3:15-CV-1778
            Plaintiff,              :
                                    :(JUDGE CONABOY)
            v.                      :
                                    :
CAROLYN W. COLVIN,                  :
Acting Commissioner of             :
Social Security,                    :
                                    :
            Defendant.              :
                                    :

---

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. (Doc. 1.)  She alleged disability beginning on July 19, 2012. (R. 19.)  The Administrative Law Judge ("ALJ") who evaluated the claim, Daniel Myers, concluded in his August 1, 2014, decision that Plaintiff's severe impairments of Status Post Patellofemoral Joint Replacement of the Right Knee, Obesity, Major Depressive Disorder, Generalized Anxiety Disorder and Posttraumatic Stress Disorder did not alone or in combination meet or equal the listings.  (R. 21-24.)  He also found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work with certain nonexertional limitations and that she was capable of performing jobs that existed in significant numbers in the national economy.  (R. 24-32.)  ALJ Myers therefore found Plaintiff was not disabled under the Act from July 19, 2012,

through the date of the decision.  (R. 26.)

With this action, Plaintiff asserts that the Acting Commissioner's decision should be remanded for the following reasons: 1) the ALJ's RFC determination is not supported by substantial evidence because he did not accord appropriate weight to medical opinions; 2) the ALJ's credibility determination is not supported by substantial evidence; and 3) the ALJ's step five determination is not supported by substantial evidence.  (Doc. 17 at 10.)  After careful review of the record and the parties' filings, I conclude Plaintiff's appeal is properly granted.

## I. Background

### A.    *Procedural Background*

Plaintiff protectively filed for DIB on July 19, 2012.  (R. 19.)  The claim was  initially denied on December 10, 2012, and Plaintiff filed a request for a hearing before an ALJ on January 29, 2013.  (*Id.*)

ALJ Myers held a hearing on June 12, 2014.  (R. 19.)  Plaintiff, who was represented by an attorney, testified as did Vocational Expert ("VE") Michael Kibler.  (*Id.*)  As noted above, the ALJ issued his unfavorable decision on August 1, 2014, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period.  (R. 33.)

On August 19, 2014, Plaintiff filed a Request for Review with the Appeals Council.  (R. 14-15.)  The Appeals Council considered

the additional evidence submitted (Exhibit 32F (R. 1300-08)) and determined it provided no basis for changing the ALJ's decision. (R. 1-2, 4.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on September 9, 2015. (R. 1-5.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On September 11, 2015, Plaintiff filed her action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.) Defendant filed her answer and the Social Security Administration transcript on November 17, 2015.  (Docs. 13, 14.)  Plaintiff filed her supporting brief on February 3, 2016.  (Doc. 17.)  Defendant filed her brief on March 2, 2016.  (Doc. 18.)  Plaintiff filed her reply brief on March 16, 2016.  (Doc. 19.)  Therefore, this matter is fully briefed and ripe for disposition.

**B.   *Factual Background***

Plaintiff was born on December 22, 1975--she was thirty-six years old on the alleged disability onset date.  (R. 32.)  She has a high school education and has past relevant work as a production assembler, housekeeper, fast food worker, store laborer, and security guard.  (*Id.*)

**1.   <u>Impairment Evidence</u>**

In her July 19, 2012, disability application, Plaintiff alleged that her ability to work was limited by Stage I cervical uterine cancer, insomnia, clinical depression, bipolar disorder,

3

anxiety, and PTSD.  (R. 213.)  At the ALJ hearing, Plaintiff also identified difficulties related to hernia surgery and knee problems.  (R. 50-51.)  When asked at the June 12, 2014, hearing what prevented her from being able to work at the time, Plaintiff responded that it was her health, specifically an issue with her legs (including being scheduled for another right knee surgery on June 25, 2014) and the prospect of her hernia coming back.  (*Id.*) Her attorney had earlier testified that originally Plaintiff's claim was "more of a mental health nonexertional claim" but as of March 2013 "consultations for knee pain really start to pick up." (R. 43.)

The following review focuses on Plaintiff's main complaints and the evidence upon which the parties rely.

*a.   Physical Impairments*

Following a radical robotic hysterectomy on May 22, 2012, to treat Stage 1A squamous cell cervical cancer, Plaintiff had a postoperative infection.  (R. 1079.)  She did well thereafter and, as of her February 14, 2014, visit with Gregory Willis, D.O., Plaintiff had no obvious recurrence of disease.  (R. 1075, 1079.)

At her October 10, 2012, visit with her primary care doctor, Lisa Malys, D.O., Plaintiff's asthma, mood disorder, and knee pain were addressed.  (R. 626.)  Her general examination was unremarkable.  (*Id.*)  Dr. Malys planned diagnostic imaging for the knee pain.  (*Id.*)  She also planned to start Celexa for the mood

4

disorder.  (*Id.*)

In addition to a review of her mental health issues at her November 2012 visit with Dr. Malys, Plaintiff reported neck pain which had eased up on the right side but not the left.  (R. 620.) Neck examination revealed that the neck was supple with full range of motion.  (*Id.*)

On December 6, 2012, Plaintiff had hernia repair surgery after which she developed an infection.  (R. 1235.)  She was taken back to the operating room on January 3, 2013, for washout of the port site infection.  (*Id.*)  Plaintiff had followup home care.  (R. 651-744.)  She reported to Dr. Malys on January 25, 2013, that she had increased neck and back pain due to having to lie on her back at night with the wound vac.  (R. 622.)

In March 2013, Dr. Malys reported that Plaintiff was no longer on Neurontin or Prozac but had started Abilify and Plaintiff stated she was still depressed and not sleeping well.  (R. 604.)  Dr. Malys also noted that Plaintiff's hernia surgeon had referred her to pain management for abdominal pain.  (*Id.*)  Abdominal examination showed no rebound tenderness, and no guarding or rigidity.  (*Id.*)  Regarding general appearance, Dr. Malys recorded that Plaintiff was in no acute distress.  (*Id.*)  No psych exam findings were recorded.  Plaintiff was to follow up  in three months.  (R. 605.)

Plaintiff was also seen in March 2013 by Stephen DeLuca, D.O.,

at the Orthopedic Institute of Pennsylvania.  (R. 608, 1297.)  She
was seen for complaints of right knee pain which Dr. DeLuca
assessed to be DJD patellofemoral joint.  (*Id.*)  He noted that
Plaintiff was doing physical therapy for other problems so he would
add right knee patellofemoral strengthening exercises, adding that
she may ultimately require patellofemoral joint arthroplasty and
her body habitus would not accommodate bracing.  (R. 608-09; 1297-
98.)  X-rays showed that Plaintiff had a large bipartite patella
which was quite arthritic, and "bone-on-bone of the lateral
patellofemoral joint with marginal osteophytes over the lateral
patella and lateral femoral condyte in the trochlear groove."  (R.
1299.)

On referral of Dr. Malys, Plaintiff saw Salah Eldin Eldohiri,
M.D., for pain management related to abdominal pain and right knee
pain.  (R. 598.)  Dr. Eldohiri noted on April 12, 2013, that the
pain had started several years earlier and was of gradual onset.
(*Id.*)  He recorded that her abdominal pain, which she rated at
5/10, was "intermittent, deep, and tingling in nature," and it got
worse with eating and better with lying down.  (*Id.*)  Physical
examination showed that Plaintiff was in no apparent distress, she
was alert and oriented x3, deep palpation of the abdomen elicited
tenderness, right knee examination revealed significant tenderness
along both menisci, and manipulation of the patella also elicited
significant pain.  (*Id.*)  Dr. Eldohiri's impression was generalized

6

body pain secondary to osteoarthritis involving multiple joints especially the right knee, low back pain, headaches, and abdominal pain post hernia repair.  (R. 598-99.)  He planned a trial of Lyrica.  (R. 599.)

At her followup with Dr. DeLuca on May 30, 2013, Plaintiff reported that physical therapy had helped minimally, taping helps but she has severe pain in the anterior aspect of her knee when the tape loosens or comes off.  (R. 1296.)  Plaintiff also reported difficulty going up and down stairs, and that any sort of bending caused severe pain.  (*Id.*)  Dr. DeLuca recorded that he had previously discussed cortisone shots with Plaintiff who, because of her needle phobia, told him she would have to be asleep before getting a shot in her knee.  (*Id.*)  Because Plaintiff was adamant about not having injections, Dr. DeLuca decided to do further testing to determine the next best step.  (*Id.*)

In May 2013, Plaintiff continued to complain of chronic pain around the mesh and persistent food intolerance to her hernia repair surgeon, Adam Braze, D.O.  (R. 1235.)  Dr. Braze noted that Plaintiff had a small persistent hernia sac at the upper aspect of her mesh.  (*Id.*)  With testing within normal limits, he referred Plaintiff to pain management and to another doctor to assess her food intolerance.  (*Id.*)  At the ALJ hearing, Plaintiff testified that her doctor said that "everything was all right" regarding the hernia for which she had surgery in December 2012.  (R. 53.)

After a June 2013 MRI (R. 1295), Dr. DeLuca recommended surgery which he performed in July 2013 (R. 1289-92).  He noted at her June 20, 2013, appointment that Plaintiff was an excellent candidate for patellofemoral joint replacement.  Dr. DeLuca summarized Plaintiff's condition as follows:

> She has failed conservative measures, including but not limited to activity modifications, weight loss, physical therapy, home physical therapy, corticosteroid injections, and time.  Her body habitus is not conducive for a brace in any way.  She has severe arthritis here.  It is not going to get better with additional conservative measures.

(R. 1293.)  Plaintiff had the surgery on July 29, 2013.  (R. 1289.)

Plaintiff saw Dr. DeLuca two weeks after the surgery and he noted she was having a lot of pain and not bending her knee. (R. 1196.)  She was taking Percocet and OxyContin.  (*Id.*)  Dr. DeLuca noted that the relpacement appeared to be in excellent position and alignment.  (*Id.*)  He prescribed outpatient physical therapy and stressed the need for Plaintiff to bend her knee "or else she is going to be unsatisfied with her long-term result from this replacement."  (*Id.*)

At her six-week post operative check on September 19, 2013, Dr. DeLuca noted that Plaintiff fell shortly after her previous visit and twisted her knee and she had increased pain in the knee since that time.  (R. 1195.)  She recorded that she had been out of her medications for two weeks and had been trying to do without,

she was using ice and a single prong cane.  (*Id.*)  Dr. DeLuca noted that Plaintiff's gait was antalgic but x-rays showed the replacement was in excellent position and overall she was improving.  (*Id.*)  He prescribed ibuprofen and Norco, recommended that she continue with phyiscal therapy, and return in two months for repeat examination.  (*Id.*)

On September 24, 2013, Plaintiff saw Dr. Eldohiri for pain management with chief complaints of right knee pain, abdominal pain, low back pain and generalized joint pain.  (R. 1193.)  He noted that she had recently undergone right knee surgery with some relief and she stated that her worst pain was in her back with an average of 7/10 on the pain scale.  (*Id.*)  Plaintiff's medications at the time were morphine sulfate, MS Contin 15 mg. on an as needed basis, vicodin and ibuprofen.  (*Id.*)  On physical examination, Plaintiff's back was showing positive facet load bilaterally, and no gross deformity of the lumbar spine or sacroiliac joints.  (*Id.*)  Dr. Eldohiri could not perform straight leg raise test or Faber due to bilateral knee pain. (*Id.*)  Plaintiff's drug screen was positive for marijuana.  (*Id.*)  She denied marijuana use and said she may have tested positive as a result of second-hand smoke, and Dr. Eldohiri told her this should not cause the positive test result.  (*Id.*)  Due to the positive drug screen, Dr. Eldohiri told Plaintiff he would not be able to prescribe opioids or controlled substances but he was willing to continue treating her with nonnarcotic

9

options.  (R. 1194.)  He planned to see her back in one month.
(*Id.*)

At her November 21, 2013, visit with Dr. DeLuca, Plaintiff
reported that she fell and landed on her right knee on November
16th.  (R. 1282.)  He noted that Plaintiff was able to continue
weight bearing and was doing physical therapy three times a week.
(*Id.*)  He also recorded that Plaintiff reported that her knee would
occasionally click and pop but that had become less frequent, less
severe, and less painful.  (*Id.*)  Dr. DeLuca noted that Plaintiff
also had a history of back pain which had increased since her fall.
(*Id.*)  Physical examination showed

> [s]he is awake, alert, and oriented times
> three.  She is in no acute distress.  She is
> morbidly obese. She is nontoxic,
> nondiaphoretic.  He left knee incision is
> healed with mild keloid formation.  Her knee
> is taped today.  Her range of motion is 0-90
> degrees. She is hypersensitive over the
> proximal aspect of her scar.  She has 5-/5
> right quad pain.
>
> She has 15 degrees of extension, 30
> degrees of forward flexion of her lumbosacral
> spinal muscles.  Distally motor and sensory
> examinations are grossly normal.

(*Id.*)  Dr. DeLuca added lumbosacral stabilization exercises and
modalities to Plaintiff's physical therapy for her acute
lumbosacral strain, and he planned to see her back in three months.
(R. 1283.)

In March 2014, Christopher Sneider, M.D., performed a repair
of a recurrent umbilical hernia (R. 1231), and on May 1, 2014, he

10

reported that Plaintiff still complained of nausea after eating, something which lasted for several months after her previous surgery and seemed to get better on its own.  (R. 1273.)  Dr. Sneider offered Plaintiff a GI referral and she refused.  (*Id.*)  He gave her "clearance to carry on without any restrictions."  (*Id.*)

Plaintiff also saw Dr. DeLuca on May 1, 2014.  (R. 1279-80.)  In the "History of Chief Complaint" section of the office notes, Dr. DeLuca stated that "Christabel is not doing well."  (R. 1279.)  He reported that Plaintiff was using a single prong cane, had a difficult time going from sitting to standing, was struggling with stairs, and could not bend, kneel, or squat.  (*Id.*)  Dr. DeLuca added that the patellofemoral replacement did not alleviate these symptoms and she was starting to get symptoms in her left knee that were similar to her right.  (*Id.*)  He noted that Plaintiff had done extensive physical therapy, she had 7/10 pain on a regular basis, and she was "not able to work, as she cannot stand for any prolonged period of time and has stiffness with prolonged sitting, even now requiring a single prong cane."  (*Id.*)  His diagnosis was "[n]ine months status post right patellofemoral replacement with ongoing patellofemoral maltracking syndrome."  (*Id.*)  Dr. DeLuca's plan was to refer Plaintiff to Dr. Kelly for a Fulkerson osteotomy which he believed would provide relief from her symptoms.[1]  (*Id.*)

---

[1]  Records submitted to the Appeals Council indicate that Dr. Kelly performed a Fulkerson osteotomy on June 25, 2014.  (R. 1301-02).  At a followup visit on July 10, 2014, Plaintiff reported that

*b.   Mental Impairments*

On March 19, 2012, John Wickizer, M.A., noted that Plaintiff, a former client of Franklin Family Services, Inc., ("FFS") returned for treatment presenting with low self esteem, mood swings, irregular sleep patterns, inconsistent work history, and poor relationships with men.  (R. 345.)  "Psychiatric History" included the notation that Plaintiff had several years of treatment for depression with moderate success in treatment.  (*Id.*)  Under "Social History," Mr. Wickizer noted that Plaintiff tended to hold jobs for a couple of months and then leave.  (*Id.*)  Under "Cultural Issues," he noted that Plaintiff, who was from Brooklyn, New York, was adjusting to living in a smaller town with a slower pace.  (R. 345-46.)  Mental status examination showed the following: depressed mood; affect full and appropriate; thought content inappropriate; thought process tangential and illogical; normal speech and motor;

---

she had improvement.  (R. 1305.)  Physical examination showed that Plaintiff was alert and cooperative, and in no acute distress. (*Id.*)  Dr. Kelly reported that the incision appeared well-healed, gentle range of motion was without pain, there was no tenderness along the medial or lateral joint line, and there was intact light touch sensation distally.  (*Id.*)  Diagnostic testing showed that the tibial tubercle osteotomy appeared to be in good position and the hardware was in good position without any evidence of loosening or complication.  (*Id.*)  Dr. Kelly assessed steady progress, noting that Plaintiff would start physical therapy, get Vicodin for pain and return in four weeks.  (*Id.*)  In August 2014, Dr. Kelly again noted steady progress.  (R. 1308.)  He recorded that Plaintiff would get a hinged brace because she was starting to move the knee, she was weightbearing as tolerated, and would follow up in four weeks.  (*Id.*)

low average intellect; fair attention span; oriented x3; impaired judgment; intact memory; hopeless outlook; increased appetite; impaired sleep; and no suicidal/homicidal ideation. (R. 346.) Her noted "strengths/interests" included that she wanted to improve her job status. (*Id.*) Mr. Wickizer diagnosed Depressive Disorder Major Recurrent Moderate, PTSD, Alcohol Abuse Continuous, and he assessed a GAF of 50. (*Id.*)

In July 2012, Plaintiff was seen by FFS clinician Kim Cuff, M.Ed. (R. 349-52.) It was noted that Plaintiff had seen several different FFS therapists due to staff changes and agency policy changes. (R. 349.) Plaintiff said she was extremely depressed and reported that she was feeling a great deal of stress related to housing issues, financial issues, and difficulty with relationships and childrearing. (R. 349.) She was not taking medication for her mental health issues at the time and agreed to medical management and outpatient therapy on a weekly basis. (*Id.*) Several strengths were identified, including a positive attitude, motivation to improve, age appropriate social interests, positive parenting skills, and a willingness to re-enroll into FFS Medical Management as per Dr. Trayer. (R. 350.) Plaintiff was diagnosed with Bipolar Disorder, Depressive Disorder Major Recurrent Moderate, PTSD, and Anxiety Disorder. (R. 351.) Her GAF was assessed to be 31. (*Id.*)

As noted above, at Plaintiff's October 10, 2012, visit with

13

her primary care doctor, Lisa Malys, D.O., Plaintiff's asthma, mood disorder, and knee pain were addressed. (R. 626.) Under "psych," Dr. Malys recorded the following: "alert, oriented, cognitive function intact, cooperative with exam, good eye contact, thought content without suicidal ideation, delusions, mood depressed, affect irritable." (*Id.*) She planned to start Plaintiff on Celexa to address the mood disorder. (*Id.*)

Dr. Malys saw Plaintiff again on October 31, 2012, for follow up on depression with Plaintiff reporting that she felt no difference since starting medication, she was not sleeping well, and she had crying spells, anxiety and moodiness. (R. 624.) Dr. Malys recorded that Plaintiff was in no acute distress; no psych exam findings were recorded. (*Id.*) Dr. Malys discussed medication options and decided to try Zoloft. (*Id.*)

On November 21, 2012, Plaintiff saw Dr. Trayer who noted that he had last seen Plaintiff in 2010. (R. 1068.) He noted that Plaintiff had undergone a radical hysterectomy for cervical cancer and she was to have hernia surgery in December about which she was anxious. (*Id.*) In addition to health concerns, she also reported significant stress related to her mother, financial concerns, and housing. (*Id.*) Dr. Trayor noted that Plaintiff had been unable to find employment due to these concerns. (*Id.*) Plaintiff also reported that she was always tired, her mood was bitchy, she was having difficulty falling asleep, she had no motivation, she was

14

hopeless about the future, and she had considerable guilt.  (*Id.*)

He reported the following examination findings:

> Motor: Patient demonstrated calm motor
> activity.  Mood/Affect: Appears appreciative
> of time with the examiner, appropriate, not
> angry and happy.   Patient describes mood as
> "Bit__y" Patient's affect is angry.
> Language/Thought: Speech is spontaneous with
> regular rate, rhythm and volume.  Language
> processing is grossly intact.  Thought
> process appears clear and appropriate.
> Associative thinking is intact.  No
> delusions, hallucinations, obsessions,
> preoccupations or somatic thoughts are
> elicited.  Cognition: Alert and oriented x3.
> Immediate memory is intact.  Recall memory is
> intact.  Attention span is fair.
> Concentration is limited.  Judgment is
> adequate.  Insight is fair.  Knowledge and
> vocabulary are consistent with education.
> Sleep: Normal.

(R. 1069-70.)  Dr. Trayer diagnosed "Depressive Disorder Major

Recurrent Moderate, Family Problem Spec Type, Adjustment Reaction

Unspec."  (R. 1070.)  Under Axix IV, Dr. Trayer noted "[s]evere,

economic problems, housing problems, occupational problems, legal

issues and problems with primary support group."  (R. 1070.)  He

assessed a GAF of 54 and prescribed Gabapentin and Prozac.  (*Id.*)

Plaintiff again saw Ms. Cuff, the FFS clinician, on November

26, 2012, for an outpatient therapy session.  (R. 1067.)

"[O]ngoing issues" included "waiting and waiting for SSI."  (Id.)

On November 28, 2012, Dr. Malys noted that Plaintiff had seen

"psych" and they had changed the Zoloft to Prozac.  (R. 620.)

Again Plaintiff was noted to be in no acute distress and no psych

15

exam findings were recorded.  (*Id.*)

     In February 2013, Plaintiff was again seen by Dr. Trayer for symptoms of depression.  (R. 612.)  Plaintiff reported ongoing conflict with family, medical concerns, and a lot of mood instability.  (*Id.*)  Dr. Trayer noted that Plaintiff was taking her prescribed medication inconsistently and did not note any medication side effects.  (*Id.*)  He reported the following examination findings:

> Motor: Patient demonstrated mild psychomotor retardation.  Mood/Affect: Appears appreciative of time with the examiner. Patient describes mood as depressed and up and down. Patient's affect is constricted. Language/Thought: Speech is spontaneous with regular rate, rhythm and volume.  Language is not impaired and word comprehension is good. Thought process appears clear and appropriate.  Associative thinking is intact. No delusions, hallucinations, obsessions, preoccupations or somatic thoughts are elicited.  Cognition: Alert and oriented x3. Immediate memory is intact.  Recent memory is intact.  Attention span is fair. Concentration is fair.  Judgment is decreased.  Insight is decreased.  Knowledge and vocabulary are consistent with education. Sleep: Normal.  Risk Assessment: Suicidality: None.

(R. 612-13.)  Dr. Trayor diagnosed Episodic Mood Disorder NOS, Depressive Disorder Major Recurrent Moderate, Adjustment Reaction Unspecified.  (R. 613.)  He noted (under Axis IV) moderate adjustment to life-cycle transitions, health issues and problems with primary support group, and he assessed a GAF of 60.  (*Id.*) The records from Plaintiff's March 25, 2013, visit with Dr. Trayor

16

are essentially the same, including that she took prescribed
medication inconsistently and was assessed with a GAF of 60.  (R.
606-07.)

As noted above, Dr. Malys reported in March 2013 that
Plaintiff was no longer on Neurontin or Prozac but had started
Abilify and Plaintiff stated she was still depressed and not
sleeping well.  (R. 604.)  Dr. Malys also noted that Plaintiff's
surgeon had referred her to pain management for abdominal pain.
(*Id.*)  Regarding general appearance, Dr. Malys recorded that
Plaintiff was in no acute distress.  (*Id.*)  No psych exam findings
were recorded.  Plaintiff was to follow up  in three months.  (R.
605.)

Throughout 2013 and into 2014 Plaintiff had numerous visits
with FFS individual therapists at which she often identified
stressors to be chronic medical problems, relationship issues, and
financial concerns.  (R. 1024-55.)  Relationship issues centered on
her live-in ex-boyfriend/father of her two children and her desire
to establish a different living situation.  (*Id.*)  Plaintiff at
times identified progress and at other times said she did not feel
like she was progressing.  (*See*, *e.g.*, R. 1044, 1050, 1052.)   In
March 2013, Plaintiff expressed fears to therapist Renee Holoviak,
that her only income was her daughter's SSI and child support and
when her daughter turned eighteen she would not have that income
and could not work "at this time."  (R. 1065.)  Office notes

17

indicate that Plaintiff was not always compliant with her medication and that she was better with consistent medication management.  (R. 1033, 1035.)  In November 2013 Plaintiff talked about the feeling of having an alter ego and she expressed the possibility that stress was making her "split."  (R. 1033.)  Ms. Holowiak noted that Plaintiff's mood at that session was more cheerful than at the previous session and Plaintiff was "open to the possibility that her mood swing is due to inconsistent medication management but would like to explore the possibility of having a dissociative identity disorder further.[2]  (R. 1033.)  In January 2014, Plaintiff discussed her frustration with the SSI process, discussed her fears of not getting on disability, including the frustration of "being in extreme poverty and being unable to work and having no support from her ex."  (R. 1024.)

Records from FFS sent by Myler Disability to the Office of Disability Adjudication & Review on April 16, 2014, indicated that Plaintiff continued to be seen at FFS with the last noted visit of March 27, 2014, but no office notes are provided.  (R. 1262-70.)

**2.   Opinion Evidence**

*a.   Disability Evaluation*

In November 2012, Stanley E. Schneider, Ed.D. examined

---

[2]  Records do not indicate that this issue was further addressed and Plaintiff does not identify additional relevant record evidence.  (*See* Doc. 17 at 7.)  However, it should be noted that many FFS records from December 2013 forward are mostly illegible.  (R. 1024-30.)

Plaintiff and provided a clinical psychological disability evaluation. (R. 466-75.) He recorded that Plaintiff said she last worked as a housekeeper at Comfort Suites and left the job due to "[a] lot of personal stuff . . . my asthma . . . the landlord . . . problems with money . . . court hearing . . ." (R. 467.) She also reported that she tried doing warehouse work but was not called often enough. (*Id.*) After being there for about a month off and on she left, noting that she "wasn't satisfied." (*Id.*) Plaintiff estimated that she had over fifteen jobs after she left high school in the eleventh grade (she later got her GED), and she denied any firings, reports, or promotions. (R. 469.) She reported positive relationships with coworkers and that she had an immediate reaction to supervisors whom she perceived as potentially disrespecting her. (R. 470.)

Plaintiff complained of personal stressors including her relationship with her children's father and medical issues. (R. 467.) Regarding the alleged clinical depression, Plaintiff reported that "she does not eat or sleep, has anger issues, saying 'I cry a lot . . . I'm overwhelmed . . . a lot of things going on I can't control . . . hernia, surgery next month .'" (*Id.*) Concerning mobility, Plaintiff reported shortness of breath, she said her knee hurts once in a while and she could stand for short periods of time. (*Id.*) Dr. Schneider added that sitting did not appear to be a problem. (*Id.*)

When Dr. Schneider asked Plaintiff why she was applying for disability, she responded "'because I feel that all the stuff going on physically and mentally I don't want to hurt nobody . . . I have anger management problems.'" (*Id.*)  When asked whether she thought she could do any kind of work, Plaintiff replied "'[n]o . . . everything bothers me . . . gets the best out of me.'" (R. 467-68.)  Plaintiff complained of anxiety with symptoms of racing heart, nervousness, sweating, and feeling overwhelmed.  (R. 468.) She did poorly in school, repeated the sixth grade, received failing grades in high school, and only completed the 11th grade but obtained a GED.  (R. 469.)

Dr. Schneider assessed Plaintiff's mood to be euthymic, but she described her mood as "bitchy."  (R. 470.)  He noted that her affect was anxious; there was no report or evidence of any perceptual disturbance; stream of thought reflected an appropriate rate, volume, articulation, and evidence of spontaneity; there was no language impairment; she obsessed about a number of current situational stressors; she said she was fearful "around too many people"; she had suicidal ideation in the past; and she was very sensitive to being challenged and/or disrespected by others and becomes immediately defensive and angry and may lash out.  (R. 470.)  Plaintiff could not identify current events; she was oriented x3; attention and concentration were mildly impaired; she had difficulty but eventually got serial 5's; and test judgment and

insight were acceptable.  (R. 471.)  Dr. Schneider diagnosed General Anxiety Disorder and PTSD, and also noted that Plaintiff appeared very easily overwhelmed.  (R. 471.)  His prognosis was guarded, her concentration was poor but her persistence acceptable, and her pace was average.  (R. 471-72.)  On functional capacity assessment, Dr. Schneider opined Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions, and markedly limited in her ability to respond appropriately to work pressures in a usual work setting and in her ability to respond appropriately to changes in a routine work setting.  (R. 474.)  Dr. Schneider noted the clinical findings supporting these assessments to include poor attention and concentration, that Plaintiff was easily confused and angered, and she had a poor tolerance for stressors.  (R. 474.)

2.  *Franklin Family Services Therapist*

On February 12, 2013, Kim Cuff, a therapist at Franklin Family Services, completed a Mental Capacity Assessment check-the-box form.  (R. 593-95.)  In understanding and memory, Ms. Cuff assessed marked limitations in Plaintiff's ability to remember locations and work-like procedures, understand and remember very short and simple instructions, and understand and remember detailed instructions. (R. 593.)  In sustained concentration and persistence, she opined Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, and she was

21

markedly limited in her ability to carry out very short and simple instructions, sustain an ordinary routine without special supervision, and complete a normal workday without interruptions from psychologically based symptoms.  (R. 593-97.)  She opined Plaintiff was extremely limited in her ability to carry out detailed instructions, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, complete a normal workweek without interruptions from psychologically based symptoms, and she would likely have 4 or more absences monthly.  (R. 593-94.)  In social interaction, Ms. Cuff opined that Plaintiff was markedly limited in her ability to appropriately interact with the general public, ask simple questions or request assistance and accept instructions and respond appropriately to criticism, and she was extremely limited in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (R. 594.)  In adaptation, she opined Plaintiff was extremely limited in her ability to respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others.  (R. 595.)  Ms. Cuff identified the clinical findings supporting her adaptation assessments to be Plaintiff's continuing

22

expression of "ongoing issues, concerns [with] anger management."
(*Id.*)

c.   *Primary Care Physician*

On April 15, 2013, Lisa Malys, D.O., completed a Residual
Functional Capacity Questionnaire, noting in the check-the-box form
that she had treated Plaintiff every three to six months since 2009
for chronic pain syndrome, sciatica, and patellofemoral syndrome.
(R. 485.)  Dr. Malys opined that Plaintiff's prognosis was poor,
and she noted Plaintiff's symptoms are pain in the abdomen, knee,
neck, left arm, and low back.  (*Id.*)  She further opined that
Plaintiff's symptoms are frequently severe enough to interfere with
the attention and concentration required to perform simple work-
related tasks, and she suffers side effects of dizziness and
drowsiness from medications.  (*Id.*)  She determined that Plaintiff
would need to recline or lie down in excess of typical breaks, and
she would need unscheduled ten to fifteen minute breaks
approximately every hour in an eight-hour workday.  (*Id.*)  Dr.
Malys concluded that Plaintiff can walk two city blocks without
rest or severe pain; she can stand/walk for only ten minutes at a
time and for two hours total in an eight-hour workday; she can sit
for forty-five minutes at a time and for up to six hours total in
an eight-hour workday; and she needs a job which permits shifting
positions at will from sitting, standing, or walking.  (*Id.*)  Dr.
Malys also opined that Plaintiff can frequently lift and carry less

23

than ten pounds, occasionally lift and carry ten pounds, and never lift and carry twenty pounds or more.  (R. 486.)  She assessed Plaintiff to have limitations in her ability to do repetitive reaching, handling, or fingering, concluding that Plaintiff can use her arms for reaching 80% of the day, her hands for grasping and twisting for 50% of the day, and her fingers for fine manipulation for 35% of the day.  (*Id.*)  Dr. Malys opined that Plaintiff would be absent from work three to four times monthly, she was not a malingerer, and she was not capable of working an eight-hour day, five days a week on a sustained basis.  (*Id.*)

3. **Hearing Testimony and Function Report**

In the Function Report completed on September 25, 2012, Plaintiff indicated that she prepares meals and does house work including ironing, changing linens, and light cleaning.  (R. 229.) Plaintiff said she gets outside every other day, shops, likes to read and write, and talks on the phone with her best friend and sister daily.  (R. 230-31.)  When asked to identify the items affected by her illnesses, injuries, or conditions, she checked only "concentration" from the list of nineteen items.  (R. 232.) She explained as follows: "I can't keep my mind on what I am doing or what [I] am suppose[d] to be doing, my mind goes back to what the first problem was before I started doing anything else."  (*Id.*) Plaintiff stated she did not have any problems with authority figures, she did not handle stress well, and it takes her a while

24

to deal with changes in routine.  (R. 233.)

At the time of the June 12, 2014, hearing, Plaintiff was living with her eighteen-year-old daughter, twelve-year-old son, and their father who worked as a cook. (R. 55.)  When asked if either child had disabilities, Plaintiff responded that her daughter had ADHD, asthma, and PTSD but she had no special needs for which Plaintiff needed to provide care.  (*Id.*)

Plaintiff testified that she last worked for Berks and Beyond at a factory job where she put together things to get ready for shipment out to stores like Walmart.  (R. 46.)  She added that she lifted about seventy-five pounds at the job, she worked there for about two months, and she left the job because she was not getting steady work hours.  (R. 46-47.)  Plaintiff did not believe she would be able to do the job at the time of the hearing because of her "stomach, due to the hernia.  Lifting the heavy stuff" and her knee, explaining that "every once in a while, my legs would, like . . . shake.  Shaking and wiggling.  I don't want to fall with anybody's products in my hand.  (R. 47.)  In more general terms, Plaintiff testified that she was unable to work full-time because of health concerns.  (R. 50.)  She referenced the knee pain and July 2013 knee surgery her lawyer had mentioned at the outset of the hearing which included an assertion of recurrent knee pain after the surgery and an upcoming second surgery.  (R. 44, 50.)  She said her other health concern affecting her ability to work was

the prospect of her hernia coming back.  (R. 51.)

Plaintiff testified that she could sit and stand but not for long periods by which she meant forty-five minutes to an hour.  (R. 63.)  She said her right leg goes numb if she sits for longer than that and she then gets up and walks around for about ten minutes. (R. 63-64.)  Plaintiff stated that her hands get numb but she does not have any trouble buttoning, zipping, holding a fork, or doing things just with her fingers.  (R. 64-65.)  She also said she has trouble going up and down stairs and she goes up and down the stairs in her apartment six or seven times a day.  (R. 66-67.) Plaintiff was using a four-point cane at the hearing which she said she had been using since the previous November to help her walk. (R. 57-58.)

When questioned by her attorney, Plaintiff added that her mental state of mind was also a factor.  (R. 54.)  When asked to explain, Plaintiff stated the following: "Well I've been seeing a psychiatrist almost all my life, just about.  But where I am now in my adult life, it seems like, you know, I don't feel like myself. And it's all these other things that, elements and stuff, and my personal life is affecting me."  (*Id.*)  Plaintiff added that she has insomnia which is not helped by the medication prescribed by Dr. Trayer.  (*Id.*)  She also said she doesn't eat but later clarified that she meant that she does not eat what "you're supposed to have on the pyramid," but she "nibble[s]" here and

26

there.  (R. 54, 60-61.)  When asked by her attorney if, there were "any other symptoms that you talked with your psychiatrist about that you feel affect your activities of daily living that are related to your mental health, other than sleep," Plaintiff responded "[n]o."  (R. 61-62.)

The Vocational Expert ("VE") testified that someone with Plaintiff's age, education, and work experience, and with the ALJ's determined RFC could not perform Plaintiff's past relevant work but could perform work as a table worker or final assembler.  (R. 68-70.)

**4.  ALJ Decision**

ALJ Myers issued his decision on August 1, 2014, considering evidence submitted up to that date.  (R. 19-38.)  He made the following Findings of Fact and Conclusions of Law:

> 1.  The claimant has not engaged in substantial gainful activity since July 19, 2012, the application date (20 CFR 416.971 et seq.).
>
> 2.  The claimant has the following severe impairments: Status Post Patellofemoral Joint Replacement of the Right Knee, Obesity, Major Depressive Disorder, Generalized Anxiety Disorder and Posttraumatic Stress Disorder (PTSD) (20 CFR 416.920(c)).
>
> 3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a). The claimant is prohibited from kneeling or crawling. The claimant is limited to occasionally climbing stairs. The claimant must avoid hazards, such as unprotected heights and nonstationary machinery that moves about the job site floor, including forklifts. The claimant is capable of handling occasional changes to the routine work setting. The claimant is capable of performing repetitive work in a stable environment. The claimant is capable of occasional interaction with coworkers and supervisors.

5.   The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.   The claimant was born on December 22, 1975 and was 36 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).

7.   The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can

28

perform (20 CFR 416.969 and 416.969(a)).

10.   The claimant has not been under a
disability, as defined in the Social
Security Act, since July 19, 2012, the
date the application was filed 20 CFR
416.920(g)).

(R. 21-33.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[3]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can

---

[3]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

only if his physical or mental impairment or
impairments are of such severity that he is not
only unable to do his previous work but cannot,
considering his age, education, and work
experience, engage in any other kind of
substantial gainful work which exists in the
national economy, regardless of whether such
work exists in the immediate area in which he
lives, or whether a specific job vacancy exists
for him, or whether he would be hired if he
applied for work.

42 U.S.C. § 423(d)(2)(A).

29

perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy.  (R. 32-33.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is

30

limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not

sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See, e.g., Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the

court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See, e.g., Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff asserts that the Acting Commissioner's decision should be remanded for the following reasons: 1) the ALJ's RFC determination is not supported by substantial evidence because he

did not accord appropriate weight to medical opinions; 2) the ALJ's credibility determination is not supported by substantial evidence; and 3) the ALJ's step five determination is not supported by substantial evidence.  (Doc. 17 at 10.)

## A.   *Medical Opinions*

Plaintiff maintains that the ALJ erred by according inadequate weight to the medical opinion evidence in favor of his own lay interpretation of the medical evidence.  (Doc. 17 at 10.)  In response, Defendant contends there is ample evidence for the ALJ's decision to give little weight to certain opinions.  (Doc. 18 at 15.)  I conclude this alleged error is not cause for remand.

## 1.   **Primary Care Physician Opinion**

Plaintiff first claims the ALJ erred in according little weight to Dr. Malys' opinion and should have accorded it greater weight because it was consistent with the record.  (Doc. 17 at 13-16.)  I conclude Plaintiff has not shown error on the basis alleged.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.  *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).  Sometimes called the "treating physician rule," the principle is codified at 20 C.F.R. 404.1527(c)(2), and is widely

accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986). The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).[4]  "A cardinal principle

---

[4] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); *see also Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008).  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

The Court of Appeals for the Third Circuit addressed a plaintiff's argument that an ALJ failed to give controlling weight to the opinion of a treating physician in *Horst v. Commissioner of Social Security*, 551 F. App'x 41, 46 (3d Cir. 2014) (not precedential).

> "Under applicable regulations and the law of this Court, opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001). Controlling weight is given when a treating physician's opinion is "well supported by

_____

> medically acceptable clinical and laboratory
> diagnostic techniques and is not inconsistent
> with the other substantial evidence."   20
> C.F.R. § 404.1527(d)(2).  "Although the ALJ
> may weigh the credibility of the evidence, he
> must give some indication of the evidence that
> he rejects and his reason(s) for discounting
> that evidence." *Fargnoli*, 247 F.3d at 43.

551 F. App'x at 46.  *Horst* noted that neither the ALJ nor the court

needed to rely on the treating physician's opinion that the

plaintiff was completely disabled: "As an initial matter, 'the

ALJ--not treating or examining physicians or State agency

consultants--must make the ultimate disability and RFC

determinations."  551 F. App'x at 46 n.7 (quoting *Chandler v.

Comm'r of Social Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); citing 20

C.F.R. § 404.1527(d)).  Although it is true that an ALJ's

credibility judgments alone cannot override a treating physician's

medical opinion that is supported by the evidence, *Morales v.

Apfel*, 225 F.3d 310, 310 (3d Cir. 2003), where an ALJ relies "upon

more than personal observations and credibility determinations in

discounting the treating physician's finding of disability," the

ALJ does not run afoul of relevant law.  *Drejka v. Commissioner of

Social Security*, 61 F. App'x 778, 782 (3d Cir. 2003) (not

precedential) (distinguishing *Morales v. Apfel*, 225 F.3d 310, 318

(3d Cir. 2000) (holding that an ALJ's credibility judgments alone

cannot override a treating physician's medical opinion that is

supported by the evidence)).  *Drejka* also noted that where the

treating physician made the determination the plaintiff was

disabled only in a form report, the Third Circuit Court has characterized such a form report, "in which the physician's only obligation was to fill in the blanks, as 'weak evidence at best.'" 61 F. App'x at 782 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)).

ALJ Myers recognized that Dr. Malys was Plaintiff's treating physician.  (R. 30.)  He gave limited weight to Dr. Malys' assessment on the basis that "it is without evidentiary support." (*Id.*)  He added that the "assessment is inconsistent with the objective findings noted throughout the medical evidence of record, which indicate that the claimant is in no acute distress, her right knee pain began to improve following patellofemoral replacement and the claimant is neurologically intact."  (*Id.*)

Plaintiff asserts "the evidence of record does not show that Plaintiff's knee pain improved with surgery: nine months after the joint replacement, Plaintiff's surgeon, Dr. DeLuca, opined that she was 'not doing well,' and 'she is not able to work, as she cannot stand for any prolonged period of time and has stiffness with prolonged sitting, even now requiring a single prong cane."  (Doc. 17 at 12.)  Plaintiff then cites Dr. DeLuca's specific objective findings which support his statement, including the following: struggle to move from sitting to standing; problems with stairs; inability to kneel, bend, or squat; antalgic gait; limited range of motion in the knee with significant pain; diagnosis of ongoing

patellofemoral maltracking syndrome; and the fact that Plaintiff required further surgery. (Doc. 17 at 12-13 (citing R. 1279, 1302-04).)  In view of this evidence, Plaintiff concludes the record contradicts the ALJ's rationale for rejecting Dr. Malys' opinion. (*Id.*)

Citing specific evidence of record, Defendant maintains that the record supports the ALJ's analysis. (Doc. 18 at 15-18.)  Based on the cited evidence, Defendant asserts that the ALJ's analysis of Dr. Malys' opinion is based on substantial evidence. (*Id.* at 18.) Defendant also criticizes Plaintiff's argument on the basis that certain evidence relied upon was not before the ALJ and other evidence post dates the opinion by a significant period of time. (Doc. 18 at 18-19.)

While I do not condone the ALJ's limited analysis, I do not find that Plaintiff's argument shows that the ALJ's assignment of limited weight to Dr. Malys' opinion was error.  Plaintiff is correct that the ALJ did not consider evidence from Dr. DeLuca's May 2014 examination in discounting the opinion. (Doc. 17 at 12-13.)  However, this evidence cannot be deemed supportive of the opinion because the form opinion is dated April 15, 2013--almost one year before Dr. DeLuca opined that Plaintiff was not doing well and required a further procedure to address patellofemoral

maltracking syndrome.[5]  (R. 485-86, 1279.) .

Defendant properly notes that other evidence to which Plaintiff cites was not before the ALJ.  Plaintiff cites record pages 1302 through 1304 in support of her argument that the record contradicts the ALJ's reason for rejecting Dr. Malys' opinion. (*See* Doc. 17 at 13.)  The cited records were submitted to the Appeals Council on October 10, 2014, and were not before the ALJ. (R. 1300-04.)  I concur with Defendant that Plaintiff does not attempt to satisfy her burden of showing that this evidence meets the requirements necessary for consideration.  (*See* Doc. 18 at 18.) Therefore, this evidence is not relevant to a determination of whether the ALJ correctly assessed Dr. Malys' opinion.  Moreover, because the cited evidence shows only that Plaintiff had another procedure on her right knee on June 25, 2014, for reasons similar to those noted in connection with Dr. DeLuca's May 2014 office notes, the mere fact of the procedure does not support error on the part of the ALJ.  (*See* R. 1302-04.)

This conclusion is bolstered by evidence showing that

---

[5]  Dr. DeLuca's May 1, 2014, office notes will be further discussed in the context of the ALJ's credibility determination. However, I note generally that the findings and opinions rendered therein do not necessarily support disability under the Act.  This is primarily so because Dr. DeLuca opined that the recommended procedure would "provide the relief of her symptoms that she requires."  (R. 1279.)  Thus, the limitations assessed at the May 1, 2014, office visit, without more, do not establish the longitudinal requirement for Social Security disability.

Plaintiff at times reported improvement in her knee symptoms after the first surgery, including her September 2013 visit with Dr. Eldohiri where she reported that she experienced some relief from her July 2013 knee surgery and her November 2013 report to Dr. DeLuca that she had some improvement of her knee symptoms.[6]  (R. 1193, 1282.)

## 2.   **Disability Evaluation**

Regarding mental health assessments, Plaintiff does not cite error regarding Ms. Cuff's Mental Capacity Assessment but points to the weight assigned the opinion of consulting examiner, Dr. Schneider.  (Doc. 17 at 13.)

Social Security regulations set out the deference due an examining source opinion, noting that a treating source brings a

---

[6]  While reports of improvement in symptoms and some pain relief are relative and do not establish that Plaintiff could engage in substantial gainful employment, the cited evidence indicates that Plaintiff's condition was not static throughout the relevant time period and, therefore, evidence which post-dates an opinion by a significant period of time cannot be deemed supportive of the opinion.  Furthermore, the record contains no RFC assessments from Dr. DeLuca or Dr. Eldohiri, the physicians who regularly treated Plaintiff after her July 2013 knee surgery, and the content of their records alone does not provide a basis to conclude that Plaintiff was unable to work throughout the relevant time period despite their periodically noted improvement.

It is also noteworthy that Plaintiff does not a provide a timeline establishing that an impairment or combination thereof had lasted for twelve months.  Although she had numerous surgeries during the relevant time period and some related complications, the record establishes that she also had periods of improvement.

perspective that cannot be obtained from reports of individual examinations.   20 C.F.R. § 404.1527(c)(2).   Section 404.1527(c)(3) states the following: "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."   Consistency is also an important consideration: "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."   20 C.F.R. § 404.1527(c)(4).

Here the ALJ assigned limited weight to Dr. Schneider's opinion to the extent it supported his RFC, noting that Dr. Schneider's assessment was based on a one-time examination and was inconsistent with the objective findings contained in the record as well as his own findings.   (R. 30.)   By way of example, ALJ Myers cited Dr. Schneider's own findings that Plaintiff was cooperative, her mood was euthymic, she was alert and oriented, and her stream of thought was appropriate.   (*Id.*)

Plaintiff maintains "the ALJ's failure to evaluate and weigh the opinion evidence in light of the record as a whole is prejudicial error."   (Doc. 17 at 13 (citing 20 C.F.R. § 416.927(c)).)   Plaintiff asserts that "the ALJ's focus on a few benign findings" ignores evidence of Plaintiff's overall functional capacity and the support provided by the treatment notes of Dr.

42

Trayer and Ms. Cuff, and Ms. Cuff's Mental Capacity Assessment. (Doc. 17 at 13-14.)  Plaintiff does not identify specific evidence from these providers other than the marked and extreme limitations found by Ms. Cuff in her assessment.  (*Id.*)

Plaintiff's cryptic argument is insufficient to show error, particularly where the notes of Dr. Trayer, the only acceptable medical source identified by Plaintiff as supportive of Dr. Schneider's assessment, *see* 20 C.F.R. § 404.1513(a); SSR 06-03p, 2006 WL 23299939 (S.S.A. Aug. 9, 2006), do not support the limitations assessed by Dr. Schneider or Ms. Cuff (*see* R. 606-07, 612-13, 1068-70).  As reviewed above, Dr. Trayer's examinations did not show that Plaintiff had debilitating mental health problems despite ongoing significant stress relating to family, finances, and housing issues.  (*Id.*)  Thus, I cannot conclude that ALJ Myers' assessment of Dr. Schneider's assessment is error on the basis asserted by Plaintiff.

## B. *Credibility*

Plaintiff contends the ALJ's determination that Plaintiff was not entirely credible is not supported by substantial evidence, specifically asserting that the ALJ's assessment of Plaintiff's knee pain was error as was his determination that Plaintiff's treatment had been "routine and conservative in nature."  (Doc. 17 at 14.)  Defendant maintains the ALJ's credibility determination is

supported by substantial evidence, pointing to the numerous reasons the ALJ found Plaintiff not entirely credible. (Doc. 18 at 23.) I conclude the ALJ's credibility determination is not supported by substantial evidence because he did not discuss probative evidence in his analysis and, therefore, this case must be remanded for further consideration.

The Third Circuit Court of Appeals has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.'" *Coleman v. Commissioner of Social Security*, 440 F. App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)). "Credibility determinations are the province of the ALJ and should only be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873 (3d Cir. 1983)).

Social Security Ruling 96-7p provides the following guidance regarding the evaluation of a claimant's statements about his or her symptoms:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements. In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects

44

> is the degree to which the statements can be
> believed and accepted as true.  When
> evaluating the credibility of an individual's
> statements, the adjudicator must consider the
> entire case record and give specific reasons
> for the weight given to the individual's
> statements.

SSR 96-7p.  "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."  SSR 96-7p.

The Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered.  20 C.F.R. § 404.1529.  First, symptoms such as pain, shortness of breath, and fatigue will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings.  20 C.F.R. § 404.1529(b).  Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work.  *Id.*  In so doing, the medical evidence of record is considered along with the claimant's statements.  *Id.*

Relevant regulations provide that factors which will be considered relevant to symptoms such as pain are the following: activities of daily living; the location, duration, frequency and intensity of the pain or other symptoms; precipitating and

aggravating factors; the type, dosage, effectiveness and side effects of medications taken to alleviate symptoms; treatment received other than medication intended to relieve pain or other symptoms; other measures used for pain/symptom relief; and other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i-vii), 416.929(c)(3)(i-vii).

The Third Circuit has explained:

> An ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985). "While there must be objective evidence of some condition that could reasonably produce pain, there need not be objective evidence of the pain itself." *Green* [*v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)].  Where medical evidence does support a claimant's complaints of pain, the complaints should then be given "great weight" and may not be disregarded unless there exists contradictory medical evidence. *Carter* [*v. Railroad Retirement Bd.*, 834 F.2d 62, 65 (3d Cir. 1987)]; *Ferguson*, 765 F.2d at 37.

*Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993).

As set out previously, the Third Circuit has clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a

reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.

Defendant correctly notes that ALJ Myers cites a "litany of reasons" for finding Plaintiff not entirely credible. (Doc. 18 at 23.)  The problem with the "litany" is that it does not include probative evidence supportive of Plaintiff's claimed knee pain and misconstrues the record regarding her knee impairment. (*See* R. 31.)  While Dr. DeLuca's May 2014 office notes discussed in the previous section of this Memorandum could not provide the suggested support for Dr. Malys' opinion, the notes are certainly probative of the status of Plaintiff's knee impairment and related symptoms at the time. (*See* R. 1278-79.)

In his general discussion of Plaintiff's medical history, ALJ Myers provided the following summary of Plaintiff's May 2014 office visit with Dr. DeLuca:

> At a follow up appointment in May 2014, Dr. DeLuca noted that the claimant alleged that she is not doing well (Exhibit 31F/3 [R. 1279]).  The claimant alleged shat she has a difficult time transitioning from a seated to standing position.  She alleged that she has continued difficulty climbing stairs.  She alleged that she cannot bend, squat or kneel. She alleged that she is having symptoms in her left knee.  Dr. DeLuca noted that the claimant ambulates with an antalgic gait, favoring her right knee.  However, Dr. DeLuca also noted that the claimant is not in any acute distress.  Dr. DeLuca noted that the claimant has pain with range of motion of the right knee, at 60 degrees.  However, Dr. DeLuca also noted that the claimant's incision is healed and there is no warmth or

> signs of infection.  Dr. DeLuca noted that x-rays of the claimant's right knee revealed that the patellar component of the claimant's patellofemoral replacement is tracking slightly superior and lateral.  Dr. DeLuca noted that there is no significant narrowing over the medial or lateral compartment.

(R. 27.)  In his discussion of Plaintiff's credibility, ALJ Myers states that

> the treatment received by the claimant relative to her impairments has been routine and conservative in nature.  The record indicates that the claimant's right knee pain improved following surgery.  Despite the claimants continued complaints, x-rays taken of the claimant's right knee revealed good position and alignment of her patellofemoral replacement with only slightly superior and lateral tracking (Exhibit 31F [R. 1277-99]). . . . The claimant alleged that she has numbness in her right leg when seated or standing for extended periods.  However, Dr. DeLuca consistently observed that the claimant was in no acute distress during examinations (Exhibit 31F [R. 1277-99]).

(R. 31.)  Noticeably absent from both reviews is the fact that Dr. DeLuca's May 2014 office notes record a Diagnosis and Plan indicative of ongoing problems requiring further surgical intervention.  (R. 1279.)  Dr. DeLuca's diagnosis was "[n]ine months post right patellofemoral replacement with ongoing patellofemoral maltracking syndrome."  (R. 1279.)  He stated the following in his Plan:

> I am referring her to Dr. Kelly.  Her patellofemoral joint has been replaced.  She is not having pain from this.  Her problem is tracking of her patella.  I believe she is going to require a Fulkerson osteotomy.

48

> Christabel is only 38 years old.  Total knee
> replacement is still a very last option for
> her.  I believe the Fulkerson osteotomy will
> provide the relief of her symptoms that she
> requires.  She has already undergone a
> lateral retinacular release.  We will have
> her see Dr. Kelly in the very near future.

(R. 1279-80.)

This review of the May 2014 notes shows that, although Dr. DeLuca recorded that Plaintiff was "in no acute distress" as noted by the ALJ, Dr. DeLuca did not minimize Plaintiff's ongoing symptoms.  Rather, he identified their source and determined that Plaintiff required further surgical intervention to address the problem.  What constitutes "routine and conservative" care is not clear; what is clear is that planned surgical intervention for ongoing symptoms deserves some acknowledgment and discussion on the part of the ALJ.[7]  The ALJ's failure to discuss this probative evidence which is supportive of Plaintiff's complaints of ongoing knee pain is cause for remand.

## C.   *Step Five*

Plaintiff's final claimed error is that the ALJ's RFC and credibility errors render his step five decision unsupported by substantial evidence.  (Doc. 17 at 15.)  While I have not found

---

[7]  I also note that a general problem with ALJ Myer's review of Dr. DeLuca's May 2014 office records is that he assesses all statements in the "History of Chief Complaint" section of the notes to be Plaintiff's subjective complaints.  (R. 31.)  While some of the statements in the History section are necessarily subjective, not all are – including the statement that "Christabel is not doing well."  (R. 1279.)

error in the ALJ's discounting of the opinions of Dr. Malys and Dr. Schneider, reconsideration of the ALJ's credibility assessment upon remand may require reconsideration of the step five determination. Therefore, further discussion of this issue is not warranted.

### V.   Conclusion

For the reasons discussed above, I conclude Plaintiff's appeal is properly granted.  This matter is remanded to the Acting Commissioner for further consideration consistent with this opinion.  An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: April 1, 2016